UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
------------------------------------------------------------------X
NANCY DALEY,

                              Plaintiff,

       - against -

MIRA, INC., and THE SCHEPENS EYE RESEARCH
INSTITUTE, INC., f/k/a EYE RESEARCH INSTITUTE
OF RETINA FOUNDATION,

                            Defendants.
------------------------------------------------------------------X

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Civil Action No.

## JURISDICTION AND VENUE

1.  Subject matter jurisdiction exists pursuant to 28 USC § 1332 in that the plaintiff is domiciled in and is a citizen of State of New York and there is complete diversity of citizenship between the plaintiff and the defendants.

2.  Upon information and belief, the defendant MIRA, INC. is a corporation organized and existing under and by virtue of the laws of the Commonwealth of Massachusetts, and maintains its principal place of business in Massachusetts.

3.  Upon information and belief, the defendant THE SCHEPENS EYE RESEARCH IN-STITUTE, INC., f/k/a EYE RESEARCH INSTITUTE OF RETINA FOUNDATION (hereinaf-ter "SERI") is a corporation organized and existing under and by virtue of the laws of the Com-monwealth of Massachusetts, and maintains its principal place of business in Massachusetts.

4.  Upon information and belief, the defendant SERI was named the Eye Research Insti-tute of Retina Foundation until on or about January 7, 1992.

5.  The amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

6.  Venue is properly laid in the District of Massachusetts pursuant to 28 USC § 1391 in that jurisdiction is founded on diversity of citizenship and a substantial part of the events or omissions giving rise to the claim occurred in the Judicial District of the United States District Court for the District of Massachusetts.

## FACTUAL ALLEGATIONS

7.  Upon information and belief, at all times relevant hereto,  the defendant MIRA, INC. was  engaged in the business of manufacturing, advertising, marketing and selling various medical devices.

8.  Upon information and belief, from some time in 1984 until some time in 1994, the defendant MIRA, INC. manufactured, advertised, marketed and sold a hydrogel implant product known as "MIRAgel."

9.  Upon information and belief, after it stopped manufacturing MIRAgel in 1994, the defendant MIRA, INC. continued to advertise, market and sell its product inventory of MIRAgel until it was exhausted.

10.  Upon information and belief, the defendant MIRA, INC., through distributors or otherwise, sold MIRAgel to customers in the United States and outside the United States.

11.  Upon information and belief, on June 21, 1996 the defendant MIRA, INC. notified the United States Food and Drug Administration ("FDA") that it had deleted MIRAgel from its product line and that it was no longer manufacturing or selling MIRAgel.

12.  Upon information and belief, MIRAgel was recalled by the Saudi Food and Drug Authority on December 3, 2009.

13.  Upon information and belief, MIRAgel was a plastic polymer product.

14.  Upon information and belief, the principal intended use of MIRAgel  was use by ret-
inal surgeons as a scleral buckling material in the surgical treatment of retinal detachment.

15.  Upon information and belief, as part of such use, MIRAgel was implanted into  pa-
tients who suffered from retinal detachment.

16.  Upon information and belief, it was generally intended and  anticipated by implant-
ing surgeons at the time of implant  that the MIRAgel would remain in the patient for the life
time of the patient in the absence of complications.

17.  Upon information and belief, it was generally anticipated by implanting surgeons at
the time of implant  that if the MIRAgel had to be removed in the future because of the devel-
opment of complications, then there would be a risk that removal of the MIRAgel might cause
injury and damage to the eye of the patient.

18.  Upon information and belief, at all times relevant hereto, the President of the defend-
ant MIRA, INC. was one Luc J. Schepens.

19.  Upon information and belief, at all times relevant hereto Luc J. Schepens owned all
of the shares of stock in the said defendant.

20.  Upon information and belief, at all times relevant hereto,  the founder and the head of
the defendant SERI  was one Charles L. Schepens, MD.

21.  Upon information and belief, Luc J. Schepens was the son of Charles L. Schepens,
 MD.

22.  Upon information and belief, MIRAgel was designed by the defendant SERI.

23.  Upon information and belief, at no time between the time that it started manufactur-
ing and selling MIRAgel until the time that it stopped manufacturing and selling MIRAgel did

the defendant MIRA, INC. employ on its staff any person who possessed any education, training, or experience with respect to the design of hydrogel implants.

24. Upon information and belief, at no time between the time that it started manufacturing and selling MIRAgel until the time that it stopped manufacturing and selling MIRAgel did the defendant MIRA, INC. employ on its staff any person who possessed any education, training, or experience with respect to properly assessing the nature and implications of adverse events that occurred in patients who had been treated with implants of MIRAgel.

25. Upon information and belief, at no time  between the time that it started manufacturing and selling MIRAgel until the time that it stopped manufacturing and selling MIRAgel did the defendant MIRA, INC. employ on its staff any person who possessed the education, training, or experience that was necessary to perform clinical trials, testing, or research with respect to MIRAgel.

26. Upon information and belief, between the time that it started manufacturing and selling MIRAgel until the time that it stopped manufacturing and selling MIRAgel the defendant MIRA, INC. employed only one person in its Quality Assurance and Regulatory Affairs Department.

27. Upon information and belief, this person had no education, training, or experience in any field of medicine or science.

28. Upon information and belief, at all times relevant hereto, the defendant SERI employed a number of ophthalmologists who possessed medical degrees and who were retinal surgeons.

29.  Upon information and belief, at all times relevant hereto, the defendant SERI employed a number of scientists with expertise in the fields of biochemistry and materials science who possessed doctorate degrees.

30.  Upon information and belief, the defendant SERI, then named the Eye Research Institute of Retina Foundation, performed all of the scientific research,  testing and  design work with respect to the development of that certain hydrogel implant that later came to be sold by MIRA, INC. as MIRAgel.

31.  Upon information and belief, the defendant MIRA, INC. never performed any scientific testing, clinical trials, or research  with respect to the design of MIRAgel.

32.  Upon information and belief,  the defendant MIRA, INC. never performed any scientific testing or analysis with respect to the nature and implications of adverse events  that occurred in patients who had been treated with implants of MIRAgel and that were reported to the defendant MIRA, INC. or that otherwise came to the attention of the said defendant.

33.  Upon information and belief, the hydrogel implant that came to be marketed as MIRAgel was first known to SERI and the defendant MIRA, INC., as the "MAI implant."

34.  Upon information and belief, the MAI implant was designed and developed by the defendant SERI.

35.  Upon information and belief, MIRAgel had the same chemical composition as the hydrogel implant that was developed by the defendant SERI and that was initially known as  the MAI implant.

36.  On or about June 5, 1984, United States Patent No. 4,452,776 entitled "Hydrogel Implant Article and Method" was issued to Miguel F. Refojo, D.Sc.,  and was assigned to the defendant SERI, then named the Eye Research Institute of Retina Foundation, as assignee.

37.  Upon information and belief, at all times relevant hereto Dr. Refojo was a bio-chemist and materials scientist and was employed by the defendant SERI as a Senior Scientist and Head of its Biomedical Polymers Laboratory.

38.  Upon information and belief,  following the issuance of the above-referenced patent the defendant SERI, then named the Eye Research Institute of Retina Foundation,  and the defendant MIRA, INC. entered into an "Exclusive License Agreement Re Hydrogel" which bears the date of  July 29, 1985.

39.  Generally,  under this Agreement the defendant SERI, then named the Eye Research Institute of Retina Foundation, granted to the defendant MIRA, INC., with minor exceptions,  the exclusive world-wide rights to any interest that the  Eye Research Institute of Retina Foundation then had or might hereafter acquire in the hydrogel product that was subject to the patent, including, but not limited to,  any and all patent rights, all confidential technical information and know-how relating to its research and development work relating to the apparatus, techniques, and information for Hydrogel, all clinical data relating to Hydrogel, ongoing rights to confer with the individuals who had developed Hydrogel at reasonable locations and times,  and, subject to the Institute's approval, the right to enter into consulting agreements with such individuals to compensate them for their services.

40.  Under this Agreement, if the defendant SERI, then named the Eye Research Institute of Retina Foundation, during the term of the Agreement developed "further technical information" intended specifically for use with Hydrogel, it was required to promptly disclose the same in writing to the defendant MIRA, INC.

41.  Under this Agreement, unless the defendant MIRA, Inc., indicated its intent not to accept such further technical information within 90 days of being notified of it, then such infor-

mation, and patent rights relating thereto, and any proprietary rights relating thereto would be added to the license to the defendant MIRA, INC. that had been granted by the Agreement.

42.  Under this Agreement, the defendant SERI, then named the Eye Research Institute of Retina Foundation, in return,  was to receive "license fees" or "royalties" to be paid by the defendant MIRA, INC.  in accordance with a defined schedule based upon the amount of the net sales of units of MIRAgel by the defendant MIRA, INC.

43.  Under this Agreement, the amount of money to be received by the defendant SERI, then named the Eye Research Institute of Retina Foundation,  from the defendant MIRA, INC. was a percentage of the net sales of the licensed product by the defendant MIRA, INC. which exceeded certain specified amounts during each fiscal year, exclusive of any sales of the licensed product to the United States government.

44.  Under this Agreement, the defendant  SERI, then named the Eye Research Institute of Retina Foundation, and the defendant MIRA, INC. agreed that they would jointly pursue any Federal Food and  Drug Administration (FDA) approvals relating to licensed products  "on a co-operative effort basis" such that matters "primarily within the capabilities of the Eye Research Institute of Retina Foundation, such as any required laboratory tests," would be handled by the Institute at its own expense and matters primarily within the capabilities or expertise of the defendant MIRA, INC., "such as any required manufacturing of instrument parts," would be handled by the defendant MIRA, INC., at its expense.

45.  Under this Agreement the defendant MIRA, INC. and the defendant SERI, then named the  Eye Research Institute of Retina Foundation,  agreed that as to areas not within the primary expertise or capabilities of either, they would "cooperate so that the work associated with obtaining [FDA or other required] approvals and expenses are shared as equally as is equi-

tably possible."  In this regard, the Agreement provided that "For example, if clinical work is required, Mira will coordinate and be responsible for the out-of-pocket expenses of the clinicians, and the Institute will provide, without charge, all equipment, supplies and similar materials required for the evaluation of the clinical results.  If time or other charges are rightfully submitted by the clinician, such costs will be shared equally by Mira and the Institute."

46.  Upon information and belief, at some time before October 22, 1986, the defendant MIRA, INC., by or through its employees, agents or servants,  filed an application for   approval of its marketing to the public  the hydrogel product referred to in the above-referenced patent, which it marketed and sold as "MIRAgel" after receiving FDA approval.

47.  Upon information and belief, at some time before October 22, 1986 FDA, pursuant to Section 510(k) of the federal Food, Drug and Cosmetic Act gave approval to the defendant MIRA, INC. to market and sell the product that the defendant MIRA, INC. called and named "MIRAgel."

48.  On October 22, 1986 plaintiff's treating  physician, Glenn J. Green, MD, an ophthalmologist and retinal surgeon in the State of  New York, performed surgery in the State of New York upon the plaintiff in order to treat a retinal detachment in the plaintiff's left eye.

49.  During the course of and as part of this surgery Dr. Green implanted MIRAgel into the plaintiff.

50.  Upon information and belief, the MIRAgel that was implanted by Dr. Green into the plaintiff  was manufactured and sold by the defendant MIRA, INC. and had been designed by the defendant SERI.

51.  Upon information and belief, the package insert that accompanied the MIRAgel that was implanted by Dr. Green in the plaintiff  did not include any warnings with respect to the use of MIRAgel.

52.  Upon information and belief, the defendants acted as joint venturers and in concert with one another in order to develop, design, market and sell MIRAgel, including the MIRAgel that Dr. Green implanted into the plaintiff, and to continue to do so until 1994 with the defendant MIRA, INC. providing the manufacturing equipment and facilities and sales personnel, which the defendant SERI lacked, and with SERI, on an ongoing basis,  providing the scientific knowledge and research expertise, personnel with scientific knowledge and research expertise, laboratory facilities, and professional connections to medical providers who were potential customers, all of which the defendant MIRA, INC. lacked.

53.  Upon information and belief,  pursuant to a joint venture and in concert with the defendant MIRA, INC. the defendant SERI, between 1984 and 1994, and prior thereto provided scientific and research expertise and personnel on an ongoing basis in order to design the manufacturing equipment necessary to manufacture MIRAgel in its various configurations, in order to respond to and assess adverse events  that occurred in patients who had been treated with implants of MIRAgel, in order to determine the content of the warnings, if any, that should accompany the product as sold, in order to determine the nature of the marketing literature that should be used to advertise the product, in order to determine whether certain professional articles and letters to the editors of medical journals  should be prepared to disseminate information concerning the MAI implant and MIRAgel, in lieu of or in addition to warnings provided after October 22, 1986, collaborated with the defendant MIRA, INC. in identifying  any outside ophthalmologists that would use the MAI implant in their patients as part of the investigational study thereof,

performed all research with respect to MIRAgel or, with respect to outside research, directed the

defendant MIRA, INC. as to what research should be done and where it should be done,  and

performed other activities customarily engaged in by the scientific and research departments of

manufacturers of medical devices in order for the manufacturer to market and continue to market

its products.

54.  Upon information and belief, after the defendant MIRA, INC. began to sell MI-

RAgel, the defendant SERI, then named  the  Eye Research Institute of Retina Foundation, in

concert with the defendant MIRA, Inc.,  participated in decisions relating to  the marketing of

MIRAgel, consulted with the defendant MIRA, INC. with respect to reported or discovered ad-

verse events involving the MAI implant and MIRAgel and the actions, if any, to be taken in re-

sponse thereto, participated with the defendant MIRA, INC. in the formulation and implementa-

tion of a plan to devise articles for publication in professional journals to be read by ophthalmol-

ogists who might consider using MIRAgel in the treatment of their patients, participated in the

decisions relating to whether or not warnings should be issued to ophthalmologists concerning

the continued use of MIRAgel to treat their patients, and otherwise engaged in actions in concert

with the defendant  MIRA, INC. that were intended to continue the manufacture and sale of the

MIRAgel medical device.

55.  Upon information and belief, the defendant MIRA, Inc. and the defendant SERI

jointly determined in consultation with one another the nature of any warnings and  marketing

literature that would be provided to ophthalmologists concerning the use of MIRAgel to treat

their patients both before and after October 22, 1986.

56.  Upon information and belief, the defendant SERI, through its agents and employees,

including, but not limited to Dr. Refojo, provided assistance to the defendant MIRA, INC. with

respect to designing the equipment that was used to produce and manufacture MIRAgel and observed the manufacturing process at the manufacturing facility of the defendant MIRA, INC. in order to attempt to ensure that the MIRAgel was manufactured properly.

57.   Upon information and belief, at all times relevant hereto, one Felipe I. Tolentino, MD was an employee of the defendant SERI and was employed as  Program Director with respect to Ophthalmic Microsurgery Research.

58.   Upon information and belief, in the course of designing the MAI implant which was later approved for sale by the FDA,  Dr. Tolentino and others employed by SERI implanted the MAI Implant into rabbits.

59.   Upon information and belief, in the course of designing the MAI implant which was approved for sale by the FDA, Dr. Tolentino and others employed by SERI performed or organized clinical trials in which the MAI implant was implanted into human patients.

60.   Upon information and belief, in the course of designing the MAI implant which was approved for sale by the FDA,  SERI left the implants in the eyes of the tested rabbits for no longer than five years, at most.

61.   Upon information and belief, in general, at the time that the defendant SERI was issued the above-mentioned patent, the MAI implants had been in place in human patients who participated in the clinical trials conducted by the defendant SERI for a period of no more than five years.

62.   Upon information and belief, in the course of designing the MAI implant which was approved for sale by the FDA,  SERI performed no accelerated aging testing to attempt to determine for how long the  MAI implants would remain safe and effective after having been implanted in the eyes of the tested rabbits.

63.  Upon information and belief, in the course of designing the MAI implant which was approved for sale by the FDA,  SERI performed no accelerated aging testing to attempt to determine for how long the  MAI implants would remain safe and effective after having been implanted in the human patients who had participated in the clinical trials.

64.  Upon information and belief, in or around 1990 the defendant MIRA, INC. rejected a proposal from an outside consulting firm to perform accelerated aging studies with respect to MIRAgel.

65.  Upon information and belief, MIRA, INC. did so because it considered the cost to be prohibitive.

66.  Upon information and belief, neither defendant ever performed any accelerated aging studies or testing with respect to MIRAgel.

67.  Upon information and belief, the defendant MIRA, INC. never performed any scientific study,  testing, or research  to attempt to determine the safety or efficacy of MIRAgel.

68.  Upon information and belief,  experience with both the MAI implant and MIRAgel as implanted in human patients, has shown  that, in general, symptoms caused by the defective nature of the MAI implant and  MIRAgel have not begun to manifest themselves in human patients until the  MIRAgel has been implanted in the patient for at least seven years, approximately,  and, in many cases, longer.

69.  Upon information and belief, in furtherance of the joint venture and concerted action referred to above, the following actions, among others, were taken in concert  by the defendants Mira, Inc. and SERI.

70.  Upon information and belief, on March 15, 1990 Luc J. Schepens sent Dr. Tolentino a draft of a text for a new sales brochure and asked him to edit the text and give to Mr. Schepens

his comments or corrections.  The advertising text included that MIRAgel "was developed by the Eye Research Institute of Retina Foundation."

71.  Upon information and belief, with that same letter, Luc J. Schepens enclosed a chart of twelve current designs of MIRAgel and stated that a thirteenth was being developed.  The letter further stated that "we want to complete the MIRAgel line" within the next twelve months and asked Dr. Tolentino, "Please give me your suggestions for additional MIRAgel designs."

72.  Upon information and belief, this letter was copied by Luc J. Schepens to Dr. Charles L. Schepens.

73.  Upon information and belief, on April 24, 1990, Dr. Tolentino sent to Luc J. Schepens  a write up about MIRAgel "which you may want to use for marketing."

74.  Upon information and belief, in the same letter Dr. Tolentino stated as follows, "My favorite model of MIRAgel is 90277, 90377, and 906.  If 908G is not popular with users, you may want to drop it.  The 90277 and 90377 are 7.5 in width.  There may be a need for a wider size, such as 9.5 or 10 mm.  Is it a problem to have these two models wider?"

75. Upon information and belief, this letter was copied by Dr. Tolentino to Dr. Charles L. Schepens.

76.  Upon information and belief, the defendant MIRA, INC. incorporated some of the language suggested by Dr. Tolentino into the marketing materials that it issued in June 1990.

77.  Upon information and belief, on May 31, 1990, Dr. Refojo told Luc J. Schepens that Dr. Tolentino had recently removed two hydrogel implants, one that had been in the patient for seven years and one that had been in the patient for nine years.

78.  Upon information and belief, on May 31, 1990 Dr. Refojo told Luc J. Schepens that the removed implants were swollen, softer, bulging and hydrated, that they were translucent instead of the original white color, and that they were friable.

79.  Upon information and belief, on May 31, 1990 Dr. Refojo told Luc J. Schepens that the removed implants were surrounded by a capsule and intact "but as soon as the capsule was opened, the implant would break into pieces."

80.  Upon information and belief, on May 31, 1990 Dr. Refojo told Luc J. Schepens that the origin of these implants was "unknown" but they were "probably EFI prototypes as MIRA made its first sale in December of 1984."

81.  Upon information and belief, on May 31, 1990 Dr. Refojo "reminded [Luc J. Schepens] that the original rabbit tests were much shorter than these implants in these two patients."

82.  Upon information and belief, on May 31, 1990 Luc J. Schepens decided to arrange a meeting to review this matter with Dr. Refojo and Dr. Tolentino.

83.  Upon information and belief, as a result of his discussion with Dr. Refojo on May 31, 1990,   Luc J. Schepens spoke to Dr. Tolentino, Charles L. Schepens, MD, and perhaps other clinicians employed by the defendant SERI.

84.  It is unknown whether any such meeting was held before June 8, 1990.

85.  Upon information and belief, on or about June 8, 1990 Drs. Tolentino and Refojo   of the defendant  SERI and Jeff Talling and Don Moore of the defendant MIRA, INC. held a meeting at which the participants  discussed complications that had required re-operations in the  cases of three patients who had received  MAI implants made by Dr. Refojo.

86.   Upon information and belief, Jeff Talling was employed by the defendant MIRA, INC. as a sales manager.

87.   Upon information and belief, Don Moore, whose  professional background was in teaching and engineering, was a director of and a consultant to  the defendant MIRA, INC. and acted as a "go between" between the defendant MIRA, INC. and the defendant SERI.

88.   Upon information and belief, the  implants discussed at the June 8, 1990 meeting had been performed  in 1977, 1979-1980, and 1980-1981.

89.   Upon information and belief, in one of these cases, the MAI implant was friable and broke as Dr. Tolentino attempted to remove it and was brownish "all the way through."

90.   Upon information and belief,  Dr. Refojo stated that he was "pretty sure" that  the MAI implants in the second and third cases were the same as in the MIRAgel formulation.

91.   Upon information and belief, at this meeting Dr. Refojo expressed the view that the friability of an implant was indicative of hydrolysis or oxidation and a change in the polymer while in the patient.

92.   Upon information and belief, Dr. Refojo stated that the "altered material would have a different, possibly higher, equilibrium water content than the original piece causing it to swell."

93.   Upon information and belief, Dr. Refojo further stated that "since the implant was constrained by the explant that on swelling the implant had no way to expand other than into the eye."

94.   Upon information and belief, at this meeting Dr. Tolentino stated that the complications may have been caused by the technique that he had used and that he would now change his procedures.

15

95.  Upon information and belief, at this meeting Dr. Tolentino expressed his intention to call back for his observation some eighty patients from his original hydrogel implant study.

96.  Upon information and belief, the view was expressed at this meeting that observations of the eighty cases were not "directly indicative" of MIRAgel performance.

97.  Upon information and belief, at this meeting Dr. Refojo stated that the defendant Mira, Inc. "should not be surprised if it sees incidents in which MIRAGEL hydrolysis (sic) and swells."

98.  Upon information and belief, Dr. Refojo further stated at this meeting that "the body was a harsh environment and that all implants are subject to calcification and/or alteration."

99.  Upon information and belief, as a result of this meeting, the defendant MIRA, INC. and the defendant SERI agreed that the following "program" would be carried out.

> a.  The defendant MIRA, INC. should write to a number of ophthalmologists who first used MIRAgel and/or used MIRAgel in large quantities asking them to report to the defendant MIRA, INC. any observations of MIRAgel during re-operations and to send to the defendant MIRA, INC. the specimen or a portion of if the MIRAgel was removed;

> b.  A general article should be published "in the Forum," which should not "focus on MIRAGEL but rather should characterize all implants as likely to have/cause some long range change in the body" and should "highlight the need for continuous observation of implants and being alert to any indication of change.";

> c.  The defendant MIRA, INC. should prepare a circular and/or package insert change calling the reader's  to attention the possibility of long term change in MIRAgel and the need to monitor whether any undesirable changes are occurring.

"This circular should point out the increased likelihood of erosion in the case of an explant under an implant."

d.  The defendant MIRA, Inc. should analyze the specimens removed by Dr. Tolentino and determine if chemical changes have taken place; and

e.  "Tolentino (and Refojo?) will prepare a journal article reporting on the results of the reexaminations of the 80 patients in the original hydrogel study."

100.  Upon information and belief, on or about  June 14, 1990, Don Moore sent a "Confidential" memo to Luc J. Schepens, Jeff Talling and Randy Hasslinger discussing the aforesaid June 8, 1990 meeting.

101.  Upon information and belief, Randy Hasslinger was then employed by the defendant  MIRA, INC. as Director of R&D/Engineering.

102.  Upon information and belief, Randy Hasslinger's professional background was in mechanical engineering and electronics.

103.  Upon information and belief, the primary activities engaged in by the R&D department of the defendant MIRA, INC. were drafting blueprints and specifications and building prototypes, and did not include research with respect to MIRAgel.

104.  Upon information and belief, Don Moore stated in the June 14, 1990 memo that he was not providing copies to Dr. Refojo and Dr. Tolentino because he "saw no point in causing them to be defensive or to refute the wording of my memo."

105.  Upon information and belief, in that memo Don Moore stated that in addition to the five "programs" discussed at the June 8, 1990 meeting, "we" should also

a.  "Review MIRAGEL process and quality control procedures to assure that any improperly polymerized product would be detected and rejected";

17

b.  Find out the nature of the testing that had been done by Dr. Refojo on experi-

mental hydrogel implants to see of they were stable in the presence of bodily flu-

ids, according to a telephone conversation that Dr. Refojo had had with Don

Moore on June 1, 1990;

c.  Review the adequacy of Dr. Refojo's earlier tests;

d.  Determine if FDA notification was required at that time and, "if not decide if

some notification is desirable";

e.  Review the possible chemical mechanisms for polymer failure;

f.  Determine tests for detecting change in "specimens" and apply the tests to "the

Tolentino specimen, retains by MIRA and Refojo, and samples recovered from

ophthalmologists during reops; "

g. Examine chemically the "long term MIRAGEL retains" and "similar retains

from [Dr. Refojo] to determine if any chemical changes have occurred";

106.  Upon information and belief, Don Moore acknowledged in this memo that "The

implants are packaged in physiological saline and observing stability here is not fully indicative

of stability in situ."

107.  Don Moore concluded his June 14, 1990 memo as follows, "Tolentino confirms

that MIRAGEL is an excellent material.  There is no indication of any significant problems other

than being cautious in applying an implant over an explant.  This is a known risk in any case and

is the decision of the ophthalmologist to determine whether such a procedure is appropriate or

not."

108.  Upon information and belief, the defendant MIRA, INC. did not obtain from the defendant SERI and the defendant SERI did not provide to the defendant MIRA, INC. any records of the clinical trials that the defendant SERI had conducted with respect to the MAI implant.

109.  Upon information and belief, the defendant MIRA, INC. manufactured and sold all of its  MIRAgel at the particular hydration level that was specified by Dr. Refojo.

110.  Upon information and belief,  the defendant MIRA, INC. was not aware of any long term changes to silicone implants that occurred while they were in the human body, such as swelling or expansion in volume.

111.  Upon information and belief, other meetings were held in 1990 with respect to MIRAgel which were attended by employees of both the defendant MIRA, INC. and the defendant SERI.

112.  Upon information and belief, by October 1990 the defendant MIRA, INC. had learned of five patients who had received the MAI implant and who had presented with "symptomatic erosion into the inner eye due to a swollen implant."

113.  Upon information and belief, on October 10, 1990 Randy Hasslinger sent a memo to Charles L. Schepens, MD asking him for his "advice and help in pursuing an organized clinical follow-up study of all patients in the Hydrogel collaborative study and subsequent high volume users of the implants."

114.  Upon information and belief, the defendant MIRA, INC. also made this request to Dr. Tolentino.

115.  Upon information and belief, the defendant SERI did not perform such a study in response to the request of the defendant MIRA, INC.

19

116.  Upon information and belief, the defendant MIRA, INC. was not in a position to perform such a study because it required a clinician with education, background, training, and experience that was not possessed by any employee of the defendant MIRA, INC.

117.  Upon information and belief, the names of all the ophthalmologists who had purchased MIRAgel from the defendant MIRA, INC. or who had purchased MIRAgel from distributors of MIRAgel were available in records that were maintained or should have been maintained by the defendant MIRA, INC.

118.  Upon information and belief, the names of all the ophthalmologists who had used the MAI implant as part of any clinical study performed by the defendant SERI were available in records that were maintained by SERI and that were available to the defendant MIRA, INC. upon request.

119. Upon information and belief, on or about October 10, 1990 Randy Hasslinger sent a letter to the FDA in which he stated that the defendant MIRA, INC. had become aware of complications with the implants that were a predecessor of MIRAgel that were comprised of "early experimental materials synthesized in a laboratory facility of an independent institute."

120.  Upon information and belief, despite the fact that only about six years had elapsed since the defendant MIRA, INC. had first sold MIRAgel, Mr. Hasslinger also stated as follows in this letter,

> MIRA today manufactures and markets an implant material of a common formulation. There are no known cases of our implants having caused any complications in dwelling (sic), nor do we expect any. (emphasis added).  All of MIRA's implant lots have been manufactured under strict GMP standards with process controls and quality inspections that guarantee structural character and consistency."

121.   Upon information and belief, on or about March 15, 1991, Mr. Hasslinger sent an-
other letter to the FDA in which he stated, in part, "There have been no patients to date, implant-
ed with MIRAgel, that have presented with this problem," i.e. the problem encountered with re-
spect to implants produced at SERI under a controlled investigational study.

122.   Upon information and belief, in the same letter, Mr. Hasslinger acknowledged that
"we use the same formulation for the MIRAgel implant line that we market today," i.e. the same
formulation that had been used in the SERI study.

123.   Upon information and belief, on March 26, 1991, Dr. Tolentino sent a letter  to var-
ious ophthalmologists advising them that he had begun using hydrogel scleral buckling material
in 1978 and still continued to use it and that he was currently performing a follow-up of cases in
which the prototype hydrogel implant developed by Dr. Refojo at the defendant SERI had been
used.

124.   Upon information and belief, Dr. Tolentino sent this letter as a result of on or more
of the meetings with the defendant MIRA, INC. that he had attended in 1990 or 1991 or as a re-
sult of other communications with the defendant MIRA, INC.

125.   Upon information and belief, in that letter Dr. Tolentino stated that several of the
cases followed for seven years or longer had shown "excessive increase in the buckle height"
and that in some of those cases "the implant was eroding through the surgically thinned sclera
and choroid."

126.   Upon information and belief, in that letter Dr. Tolentino further stated that "such
implants were difficult to remove in one piece because they had become friable, breaking easily
into small pieces."

127.  Upon information and belief, Dr. Tolentino further stated, "Dr. Refojo, who developed this material, and I did not anticipate these changes."

128.  Upon information and belief, in that letter Dr. Tolentino stated that he was "interested in knowing" what the recipients' long-term observations had been with respect to hydrogel implants for scleral buckling, "especially in cases that had at least 5 years of follow-up."

129.  Upon information and belief, in that letter Dr. Tolentino stated that "No such complications have been recorded with the commercially available hydrogel used as a scleral implant (Miragel)."

130.  Upon information and belief, in that letter, Dr. Tolentino further stated as follows, "However, I recommend a yearly follow-up of your patients with this implant in order to check upon possible increase in the height of the buckle.  If you should observe such an increase, I am requesting that you inform me of the details of the case.  Since these cases are rare, we could then publish a report on these observations."

131.  Upon information and belief, as a result of the June 8, 1990 meeting referred to above, there came to be published  in the January 1992 volume of the Archives of Ophthalmology an article  entitled, "Long-term complications of the MAI Hydrogel Intrascleral Buckling Implant."

132.  The authors of this article were identified as Jesus F. Marin, MD,  Felipe L. Tolentino, MD, Miguel F. Refojo, DSc, and Charles L. Schepens, MD.

133.  Upon information and belief, this article had been accepted for publication on May 20, 1991.

134.  The article reported on the results of a follow-up study that had been conducted with respect to 82 patients who had received MAI implants from 1979 to 1982.

135.  The article reported that 7 of the 82 patients (8.5%) had thus far developed complications from swelling of the MAI implant.

136.  The article concluded as follows:

> The MAI implant is the precursor of the present-day MIRAgel;
> they have the same chemical composition.  Hence, potential prob-
> lems related to swelling of the implant exist and warrant diligent,
> periodic follow-up of patients for a long time after surgery.  How-
> ever, to our knowledge, similar complications in patients who re-
> ceive an episcleral implant have not been reported.  We have used
> MIRAgel as an episcleral implant in a large number of patients
> since 1986 and have not observed such complications.

137.  Upon information and belief, this article in draft form was reviewed by the defend-
ant MIRA, INC.  before it was published in the Archives of Ophthalmology.

138.   Upon information and belief, the January 1992 volume of the Archives of Oph-
thalmology also published a Letter to the Editor that had been submitted by Randy Hasslinger on
behalf of the defendant MIRA, INC.

139.  The Letter stated in part that the MAI implants referred to in the article were "ex-
perimental and known to contain variable levels of components that would account for the dif-
ferences described in the spectra."

140.  The Letter further stated, "To date there have been no patients with MIRAgel im-
plants who have developed the complications described in the report by Marin et al.  MIRAgel
continues to be manufactured according to good manufacturing practice guidelines for strict for-
mulation and process controls."

141.  Upon information and belief, the January 1992 volume of the Archives of Ophthal-
mology also published a Reply by the authors of the article referred to above.

142.  In that Reply, the authors of the article stated that there were "no data available to
them" to support the statement of Mr. Hasslinger quoted in paragraph 139 of this Complaint.

143.  In that Reply, the authors also stated that "MAI polymer, made by the same procedure as the retrieved implants, and the currently available MIRAgel implants have the same chemical composition, as is demonstrated by the identical micro-Fourier transform infrared spectra."

144.  Upon information and belief, the defendants determined that the publication of the above-referenced article in the January 1992 volume of the Archives of Ophthalmology was sufficient to communicate to all physicians who had already implanted MIRAgel in their patients all of the risks and hazards of having used  MIRAgel to treat their patients, including, but not limited to, the risks and hazards that MIRAgel that remained in the body might swell over time and that such swelling might result in serious  injury to the eye of the patient, and that, over time, MIRAgel might become friable such that it might not be able to be removed from the body without causing further injury to the patient.

145.  Upon information and belief, the defendants continued to receive additional reports from physicians that MIRAgel was swelling and degrading in the eyes of patients into whom the physicians had implanted MIRAgel.

146.  Upon information and belief, by letter dated November 11, 1993 a Dr. Bruce, whose first name is presently unknown to the plaintiff, but may be known to the defendants, reported to the defendant MIRA, INC. that a MIRAgel implant that had been in place approximately five years crumbled the way that rotten wood would crumble when he tried to remove the implant.

147.  Upon information and belief, on January 27, 2014, after the defendant MIRA, INC. had received additional reports of adverse incidents between 1990 and 1994,  Luc J. Schepens sent a memo to Charles L. Schepens, MD and Dr. Tolentino.

148.  Upon information and belief, the memo asked the following questions:

1.  How serious is the situation we are facing?

2.  Should we issue a caution to all MIRAgel users and potential MIRAgel users explaining the possibility of degradation of the material and perhaps enclosing a copy of Fel Tolentino's paper from January 1992?

3.  Would it be safer to stop selling the material and simply take it off the market?

4.  Are there any other courses of action you would like to recommend?

149.  Upon information and belief, Dr. Tolentino responded to this memo by memo dated February 3, 1994, and titled "MIRAgel Degradation," which he sent to Luc J. Schepens and copied to Dr. Schepens and Dr. Refojo.

150.  Upon information and belief, this memo stated as follows:

1.  Thank you for your memo of January 27, 1994.

2.  In response to your #1 question on what action to take, I believe this degradation is serious in eyes with intrascleral implant. Miragel implants should be removed in all these cases. The risk for episcleral implant is of course less and will need regular yearly follow up.

3.  Mira should issue a caution to all Miragel users that Miragel may degrade after 5 to 10 years.

4.  I personally feel that this product should be taken off the market to avoid further problems.

151.  Upon information and belief, the defendant MIRA, INC. did nothing to advise users or potential users of MIRAgel that MIRAgel intrascleral implants should be removed in all cases.

152.  Upon information and belief, the defendant SERI did nothing to advise users or potential users of MIRAgel that MIRAgel intrascleral implants should be removed in all cases.

153.   Upon information and belief, the defendant MIRA, INC. did nothing to issue a caution to all MIRAgel users that MIRAgel  may degrade after 5 to 10 years.

154.   Upon information and belief, the defendant SERI did nothing to issue a caution to all MIRAgel  users that MIRAgel may degrade after 5 to 10 years.

155.   Upon information and belief, in March 1994 one Michael Warren sent a memo to Luc J. Schepens and Roger O'Brien.

156.   Upon information and belief, at that time Michael Warren was employed by the defendant  MIRA, INC. in the facility that had produced and manufactured MIRAgel.

157.   Upon information and belief, at that time, Roger R. O'Brien was the head of the Quality Assurance department of the defendant MIRA, INC.

158.   Upon information and belief, the memo attached two letters from surgeons reporting complications in using MIRAgel and stated, "I believe it would be prudent for Mira to make a business decision as to the viability of MIRAgel as a product. We have added additional warnings to the product labeling.  See attached.  We may want to make an effort to alert the vitreoretinal community using a mailing or newsletter."

159.   Upon information and belief, the defendant MIRA, INC. chose not to send such a mailing or newsletter to ophthalmologists who had used MIRAgel in treating their patients.

160.    Upon information and belief, in the latter part of 1994, the defendant MIRA, INC. ceased to manufacture MIRAgel.

161.   Upon information and belief, Luc J. Schepens has testified that it did so "strictly for economic reasons."

162.   Upon information and belief, on or about April 25, 1995, the sole manufacturing facility of the defendant MIRA, INC. Was closed pursuant to a consent decree that had been en-

tered in this Court as a result of an action for injunctive relief commenced on April 7, 1995 by

the United States of America against the defendant MIRA, INC. , Luc J. Schepens and Roger R.

O'Brien under civil action number 95-10731.

163. Upon information and belief, this action alleged that the defendants therein had vio-

lated provisions of the Federal Food, Drug, and Cosmetic Act and various federal regulations

promulgated thereunder with respect to a product known as the " Cryo probe" and with respect

to silicone eye implants used to treat retinal detachments.

164. These violations included failing to control manufacturing inspections to ensure that

devices conformed to their original design, failing to investigate and maintain a written record of

investigations of complaints and other incidents in which devices failed to meet performance

specifications, and failing to provide personnel with the necessary training to perform assigned

responsibilities adequately.

165. Upon information and belief, Roger R. O'Brien, testified in a personal injury case

involving MIRAgel that the defendant MIRA, INC. "looked at regulatory affairs and quality con-

trol as an obstacle," that in the early 1990's he became concerned about a "trend" of increasing

complaints that caused him to "approach people internally," and that he was concerned that the

defendant MIRA, INC. "was not as responsive as they should have been about this problem that

[he] was bringing to their attention."

166. Upon information and belief, the above-referenced action by the United States was

preceded by the FDA having sent to the defendant Schepens an FDA Regulatory Letter in 1991

and a Notice of Adverse Findings Letter in 1986 concerning violations by the defendant MIRA,

INC. of Good Manufacturing Practices regulations.

167.  Upon information and belief, the above-referenced action was preceded by inspections of the defendant MIRA, INC. by FDA  in 1991, 1992, and 1993.

168.  Upon information and belief, the consent decree referred to above was the result of negotiations between counsel for the defendants therein and counsel for the United States.

169.  Upon information and belief, the above-referenced consent decree did not refer to MIRAgel because the defendant MIRA, INC. had ceased to manufacture MIRAgel before April 1995, thus making injunctive relief unnecessary with respect to MIRAgel.

170.  Upon information and belief, the manufacturing facility of the defendant MIRA, INC.  did not re-open until the Spring of 1996.

171.  Upon information and belief, following and as a result of  the issuance of the above-referenced consent decree  Luc J. Schepens no longer had any role in the day to day operations of the defendant MIRA, INC. after April 1995.

172.  Upon information and belief, one Daniel T. Weidenthal, MD was a frequent user of MIRAgel and had been a member of a collaborative study conducted by the defendant SERI.

173.  Upon information and belief, by letter dated November 21, 1995 Dr. Weidenthal reported that in the cases of two patients upon whom he had operated eight years earlier "a corner of the MIRAgel implant had eroded through the choroid and could be seen beneath the retina" and that "It appeared as if the implants had actually expanded in volume."

174.  Upon information and belief, in that letter Dr. Weidenthal asked the defendant MIRA, INC. to respond to a number of questions that he set forth in that letter.

175.  Upon information and belief, such questions included the following: "Is the above described problem commonly associated with the Miragel implant?  Does the implant continue

to expand or is this a self-limiting problem? Has there been a product recall?  If so, when and why? Have complications similar to that which I have above described been reported?"

176.  It is unknown to the plaintiff at present whether or how  the defendant MIRA, INC. Responded to the above-referenced letter from Dr. Weidenthal, but this information  may be known to the defendants.

177.  Upon information and belief, in 1997 Roger R. O'Brien, the Quality Assurance manager of the defendant MIRA, INC. sent a memo to one D. O'Brien, who, at that time, was the President of the defendant MIRA, INC.

178.  Upon information and belief, in such memo Roger R. O'Brien made reference to two reports made in 1997 concerning extruding and fragmentation of MIRAgel.

179.  Upon information and belief, in such memo Roger R. O'Brien stated that he had spoken with Jim Clasby about the possibility of recruiting Dr. Refojo to prepare "an explanation document of what is taking place long-term that we can send to past users of Miragel as some complaints are requesting the next steps they should take after these patients are reop'ed or ex- amined. An explanatory statement, letter or engineering directive from a knowledgeable devel- oper sent via a sales bulletin to past users and to any future complainants should be considered. Your views, please."

180.  Upon information and belief, the defendant MIRA, INC. did not send out any such written statement to any past users in or after 1997.

181.  The identity and employment affiliation of Jim Clasby is presently unknown to the plaintiff, but may be known to the defendants.

182.  Upon information and belief, the first civil action to recover damages for personal injuries that was filed by a patient who had received a MIRAgel implant was filed against the defendant  MIRA, INC. in 1997 or 1998.

183.  Upon information and belief, in August 1998, the defendant MIRA, INC. received a letter from its Japanese distributor reporting that three patients who had received MIRAgel implants six to eight years earlier had complained that they felt something foreign in their eyes.

184.  Upon information and belief, that letter also stated that when their doctor opened their eyes it was found that the MIRAgel had become transformed and was fragile.

185.  Upon information and belief, the letter further stated that the doctor was requesting documents or an explanation concerning the possibility of change in MIRAgel after it had been in place for long periods of time.

186.  It is presently unknown to the plaintiff whether or how the defendant MIRA, INC. responded to this letter.

187.  Upon information and belief as of July 9, 2003 there were six more civil actions that were pending that had been brought by patients who had received  MIRAgel implants and who were seeking to recover damages for personal injuries.

188.  Upon information and belief, at least five such actions were commenced after July 9, 2003.

189.  Upon information and belief, other such actions may have been commenced in or after 1997 and resolved before July 9, 2003.

190.  Following the surgery performed by Dr. Green, the plaintiff continued to treat and consult with him as her primary ophthalmologist until March 2016.

191.   According to a report by Dr. Green to Stanley Chang, MD, dated March 9, 2016, the plaintiff "did well" with her left eye until September 2015 when she developed a mild uveitis in that eye with macular edema on optical coherence tomography.

192.   After further treatment by Dr. Green after September 2015, in January 2016 Dr. Green debulked the MIRAgel implant, after it was found intruding into the globe of the eye, but the whole implant "could not be removed because of intrusion into the globe and the potential for loss of globe integrity."

193.   On or about March 9, 2016 Dr. Green referred the plaintiff to Dr. Stanley Chang for further treatment of her left eye at New York-Presbyterian Hospital in New York City.

194.   The plaintiff underwent nine surgeries on her left eye at New York-Presbyterian Hospital.

195.   The plaintiff was determined to be legally blind by the New York State Commission for the Blind and has been registered therewith as legally blind since February 24, 2017.

196.   Upon information and belief, as of January 30, 2017 the plaintiff's best corrected visual acuities were 20/300 in the right eye and "hand motion" in the left eye.

197.   The last surgery that was performed on the plaintiff at New York-Presbyterian Hospital was enucleation of the left eye on October 20, 2017, after which the plaintiff's only vision was in her right eye, the visual acuity of which is no better than 20/300.

198.   The plaintiff has been otherwise injured and damaged as a result of the implanting of MIRAgel in her body on October 22, 1986 and subsequent acts and omissions of the defendants.

**AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST BOTH DEFENDANTS**

199.  Upon information and belief, the negligent, reckless and careless acts and omissions of the defendants, their officers, agents, servants and/or employees were a proximate cause of the plaintiff's injuries and damages.

200.  Upon information and belief, the negligent, reckless and careless acts and omissions of the defendants, their officers, agents, servants and/or employees consisted of, among other things, designing a product, to wit, the MIRAgel implant,  in an unsafe, defective, and hazardous condition; failing to properly and sufficiently  test the product before it was first sold to physicians in 1984 and to Dr. Green in 1986; failing to properly and sufficiently  test the MAI implant and MIRAgel to determine the long-term effects of the product on the human eye; failing to perform any accelerated aging studies or testing with respect to the MAI implant or MIRAgel; selling and marketing the product without first having performed long-term testing of the MAI implant or MIRAgel on either rabbits or humans; permitting MIRAgel, a product based on the MAI implant, to be marketed and sold to the public when it had been defectively designed and improperly and insufficiently tested; failing to include any warnings with MIRAgel until 1987 and, thereafter, providing warnings that were inadequate and insufficient;  in representing to physicians, consumers and the general public that MIRAgel was safe and free of risks and hazards when defendants knew or should have known, through adequate and proper testing and studies that MIRAgel could be harmful and capable of causing serious injuries to patients in ways that other materials that had been customarily used for the same purpose, such as silicone, were not; in failing to conduct proper and adequate testing after receiving reports that MIRAgel was causing injuries to patients after long term use; in failing to inform and notify physicians of the risks

and hazards associated with the use of MIRAgel after having received such reports; and the defendants were in other ways negligent, careless, and reckless.

201.  By reason of the foregoing the plaintiff was caused to sustain severe and serious personal injuries to her mind and body, some of which are permanent, with permanent effects of pain, disability, deformity, disfigurement,  loss of vision and sight, and mental and emotional distress.  Further, the plaintiff was caused to spend and become obligated for diverse sums of money for the purpose of obtaining medical care in an effort to alleviate the suffering and ills sustained as a result of the implanting of MIRAgel in her body, and the plaintiff was further caused to lose substantial periods of time from her normal activities, and, upon information and belief, will continue in that way into the future and suffer similar losses.

202. By reason of the foregoing, the plaintiff has been damaged in an amount which exceeds $75,000.00 and requests compensatory damages from the defendants  to compensate her fully for her injuries and damages.

### AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST BOTH DEFENDANTS

203. The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "7" through "198" of this Complaint with the same force and effect as if more fully set forth herein at length.

204.  The defendants designed, manufactured, sold and placed into the stream of commerce a product, MIRAgel.

205.  The said product was not suited for its purpose and was defective.

206.  The defendants assumed a strict products liability to users of the product and persons injured by the defective product, including the plaintiff.

207.  The defective condition of the product was an actual and proximate cause of the aforesaid injuries to the plaintiff.

208.  Upon information and belief, the defendants also failed to provide necessary and adequate warnings to accompany the product and with respect to the product at the time that it was sold to the plaintiff's treating physician, Dr. Green, for use in the surgery performed on October 22, 1986.

209.  Upon information and belief, the failure to provide such warnings was an actual and proximate cause of the aforesaid injuries to the plaintiff.

210.  By reason of the foregoing the plaintiff was caused to sustain severe and serious personal injuries to her mind and body, some of which are permanent, with permanent effects of pain, disability, deformity, disfigurement,  loss of sight, and mental and emotional distress.  Further, the plaintiff was caused to spend and become obligated for diverse sums of money for the purpose of obtaining medical care in an effort to alleviate the suffering and ills sustained as a result of the implanting of MIRAgel in her body, and the plaintiff was further caused to lose substantial periods of time from her normal activities, and, upon information and belief, will continue in that way into the future and suffer similar losses.

211.  By reason of the foregoing, the plaintiff has been damaged in an amount which exceeds $75,000.00 and requests compensatory damages from the defendants  to compensate her fully for her injuries and damages.

**AS AND FOR A THIRD  CLAIM FOR RELIEF AGAINST BOTH DEFENDANTS**

212.  The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "7"  through "208"  of this Complaint with the same force and effect as if more fully set forth herein at length.

213.   Serious risks and hazards arising out of the use of MIRAgel on a long term basis became known to the defendants no later than May 1990.

214.   Thereafter, the defendants became increasingly aware through communications from physicians, complaints, and law suits filed by patients that the use of MIRAgel posed serious risks to the health of patients that were not posed by more traditional implants, such as silicone.

215.   This knowledge,  which was imparted to the defendants after October 22, 1986, imposed upon them a post-sale duty to properly and adequately warn Dr. Green and the plaintiff of the risks and hazards associated with the continued presence of MIRAgel in the body of the plaintiff.

216.   Upon information and belief, at no time from October 22, 1986 to the present did the defendants issue such a warning to Dr. Green or to the plaintiff by means of a "Dear Doctor" letter, patient bulletin, or otherwise, although certain employees of both defendants suggested that warnings of that kind be given.

217.   Upon information and belief, as a result thereof, the MIRAgel implant, or a part thereof,  remained in the plaintiff's body from October 22, 1986 until some time in 2016 when it was finally removed completely and with difficulty after multiple surgeries.

218.   Upon information and belief, the longer that the MIRAgel remained in the plaintiff's body, the more difficult it became to remove it because of its increasingly  friable nature.

219.   Upon information and belief, the failure to provide post-sale warnings was an actual and proximate cause of the aforesaid injuries to the plaintiff.

220.   By reason of the foregoing the plaintiff was caused to sustain severe and serious personal injuries to her mind and body, some of which are permanent, with permanent effects of

pain, disability, deformity, disfigurement,  loss of sight, and mental and emotional distress.  Further, the plaintiff was caused to spend and become obligated for diverse sums of money for the purpose of obtaining medical care in an effort to alleviate the suffering and ills sustained as a result of the implanting of MIRAgel in her body, and the plaintiff was further caused to lose substantial periods of time from her normal activities, and, upon information and belief, will continue in that way into the future and suffer similar losses.

221.  By reason of the foregoing, the plaintiff has been damaged in an amount which exceeds $75,000.00 and requests compensatory damages from the defendants  to compensate her fully for her injuries and damages.

**AS AND FOUR A FOURTH CLAIM FOR RELIEF AGAINST BOTH DEFENDANTS**

222.  The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "7"  through "221"  of this Complaint with the same force and effect as if more fully set forth herein at length.

223.  The defendants as designer, manufacturer, marketer, promoter, distributor or seller of MIRAgel impliedly warranted that MIRAgel was merchantable and fit for the ordinary purposes for which it was intended.

224.  Through their acts and omissions, the defendants breached the implied warranty of fitness and the warranty of fitness for a particular purpose because the MIRAgel which was sold to the plaintiff and other members of the public was defective and unreasonably dangerous to users and consumers.

225.  The unreasonably dangerous condition of MIRAgel was foreseeable and could have been avoided, substantially reduced or even eliminated if the defendants had adopted a reasonably safe alternative implant design.

226.  Upon information and belief, the defendants' breaches of warranty were  an actual and proximate cause of the aforesaid injuries to the plaintiff.

227.  By reason of the foregoing the plaintiff was caused to sustain severe and serious personal injuries to her mind and body, some of which are permanent, with permanent effects of pain, disability, deformity, disfigurement,  loss of sight, and mental and emotional distress.  Further, the plaintiff was caused to spend and become obligated for diverse sums of money for the purpose of obtaining medical care in an effort to alleviate the suffering and ills sustained as a result of the implanting of MIRAgel in her body, and the plaintiff was further caused to lose substantial periods of time from her normal activities, and, upon information and belief, will continue in that way into the future and suffer similar losses.

228.  By reason of the foregoing, the plaintiff has been damaged in an amount which exceeds $75,000.00 and requests compensatory damages from the defendants  to compensate her fully for her injuries and damages.

**AS AND FOR A FIFTH  CLAIM FOR RELIEF AGAINST DEFENDANT MIRA, INC.**

229.  The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs numbered "7"  through "228"  of this Complaint with the same force and effect as if more fully set forth herein at length.

230.  Upon information and belief, the defendant MIRA, INC., through its officers and directors and their agents, committed acts and omissions that show a conscious indifference and utter disregard for their effects upon the safety and rights of others.

231.  Upon information and belief, such acts and omissions included, but were not limited to the following: falsely marketing MIRAgel as an implant as to which  "[f]ifteen years of rigorous laboratory research and well-designed clinical trials have shown MIRAgel to be safe,

effective, and well tolerated by the eye" even after it had received information that tended to indicate that this claim was not true; falsely marketing MIRAgel in other ways, including, but not limited to, that it was "non-biodegradable"; failing  to warn at any time that MIRAgel tended to swell and to become friable as a result of being present in the human body for a number of years; falsely representing to the FDA at the time that it sought approval to market MIRAgel under Section 510(k) of the federal Food, Drug and Cosmetic Act that MIRAgel was substantially equivalent to previously approved scleral buckling agents, when, upon information and belief, no hydrogel implants had been previously approved as scleral buckling agents by the FDA;  attempting to distinguish the MAI implant from MIRAgel although  the two implants  were purported to have the same chemical composition in communications with the FDA and the public; declining to perform accelerated aging studies when it became apparent that there was good reason to believe that MIRAgel swelled and became friable as it remained in the human body over time; failing to report adverse incidents involving the MAI implant to the FDA; failing to follow up on the plans allocated to it at meetings in 1990 at which problems with MIRAgel were discussed with the defendant SERI; failing to follow the recommendations of Dr. Tolentino made on February 3, 1994; failing to engage in "good manufacturing practices" within the meaning of federal regulations, resulting in a government enforced closure of its only manufacturing facility in 1995; in providing a MIRAgel package insert that stated that, "As with all implants the possibility of extrusion, erosion or infection exists. <u>However, extensive clinical studies have shown that the risk of these complications is lower with this material than with any other available buckling material"</u> (emphasis added); failing to consider issuing post-sale warnings after it ceased to manufacture and sell MIRAgel; never obtaining from the defendant SERI the written technical information which the defendant MIRA, INC. was entitled to have under the  "Exclusive License

Agreement Re Hydrogel"; marketing MIRAgel without performing or having anyone else perform any analysis of the pre-market testing performed by the defendant SERI; marketing MIRAgel before  obtaining any information about what its effects might be after it remained in the body of a patient for five or more years; and in being motivated by  "strictly *** economic reasons" in deciding to no longer manufacture and sell MIRAgel.

232.  In the case of <u>Rosner v. Mira, Inc., et al.</u>, both the trial Court in 2004 and an intermediate appellate Court in 2005 determined that the plaintiff's allegations in that case with respect to the acts and omissions of the defendant MIRA, INC. concerning the MIRAgel implant were sufficient to allege a cause of action for punitive damages as a matter of the law of New York.

233.  By reason of the foregoing the plaintiff is entitled to an award of punitive damages as against the defendant MIRA, INC.


WHEREFORE, plaintiff demands judgment against both defendants for compensatory damages and against the defendant MIRA, INC. for punitive damages, together with the costs and disbursements of this action.

Dated:  February 23, 2018

Respectfully Submitted,

For the Plaintiff,

By her Attorneys

*Harry M. Haytayan, Jr.*

_____
Harry M. Haytayan Jr.
B.B.O. #548946
Haytayan & Haytayan, PLLC
One Tara Boulevard, Suite 200
Nashua, New Hampshire 03063
(Tel) 603-921-1336
(Fax) 603-324-7101
**harry@haytayanlaw.com**


Michael Kolb
(Pro Hac Vice Admission to be sought)
Mainetti, Mainetti & O'Connor, PC
130 North Front Street
Kingston, NY 12401
(845) 331-9434
mkolb@mmolaw.net


### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiff hereby demands a trial by jury of all issues herein that are triable by a jury.

Dated:  February 23, 2018

*Harry M. Haytayan, Jr.*

_____
Harry M. Haytayan Jr.
B.B.O. #548946
Haytayan & Haytayan, PLLC
One Tara Boulevard, Suite 200
Nashua, New Hampshire 03063
(Tel) 603-921-1336
(Fax) 603-324-7101
**harry@haytayanlaw.com**


Michael Kolb
(Pro Hac Vice Admission to be sought)
Mainetti, Mainetti & O'Connor, PC
130 North Front Street
Kingston, NY 12401
(845) 331-9434
mkolb@mmolaw.net