UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 1:18-cv-10353-LTS

| | |
|---|---|
| **NANCY DALEY,** | ) |
|     **PLAINTIFF** | ) |
| | ) |
|  VS. | ) |
| **MIRA, INC., and THE SCHEPENS EYE,** | ) |
| **RESEARCH INSTITUTE, INC., f/k/a EYE** | ) |
| **RESEARCH INSTITUTE OF RETINA** | ) |
| **FOUNDATION,** | ) |
|     **DEFENDANTS** | ) |

**DEFENDANT THE SCHEPENS EYE RESEARCH INSTITUTE,
INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**ARGUMENT**

Plaintiff's memorandum in opposition to SERI's motion for partial summary judgment and in support of her motion for partial summary judgment ("Pl.'s Memo.") asserts that the Court should rule that, pursuant to Massachusetts choice-of-law considerations, M.G.L. c.231, §85K is inapplicable to her claims against SERI. In that vein, plaintiff effectively adopts SERI's argument that the "functional approach" to resolving choice-of law disputes is prescribed in *Bushkin Assocs.* v. *Raytheon Co.*, 393 Mass. 622 (1985), as set forth in §6 of the Restatement (Second) of Conflict of Laws (1971) ("Second Restatement") and/or by R.A. Leflar, American Conflicts of Law, §99 at 195 (3d ed. 1977) ("Leflar").[1] Unlike SERI, however, plaintiff asserts that this "functional approach" mandates that the Court follow New York law – which has

---

[1] The factors which Professor Leflar posits a court should consider include: "(A) Predictability of results; (B) Maintenance of interstate … order; (C) Simplification of the judicial task; (D) Advancement of the forum's governmental interests; and (E) Application of the better rule of law." *Saharceski* v. *Marcure*, 373 Mass. 304, 312 n.7 (1977). The Supreme Judicial Court has stated that it agrees with Professor Leflar's assessment that his five factors for consideration "generally parallel" the considerations cited elsewhere, *e.g.*, in §6(2) of the Second Restatement. *Bushkin*, *supra* at 634, *citing* Leflar, *supra* at 194-195.

1

abolished charitable immunity – to all substantive tort issues in this case, thereby rendering irrelevant any consideration of c.231, §85K.  *See* Pl.'s Memo., p. 17.

Although plaintiff correctly refers to four sections of the Restatement (Second) as relevant to resolution of the choice-of-law issue related to the applicability of c.231, §85K, *i.e.* §§6 ("Choice-Of-Law Principles"), 145 ("The General Principle"), 146 ("Personal Injuries") and 168 ("Charitable Immunity"), her discussion of §168 is limited to a single sentence: "The law selected by application of the rule of §145 determines issues of charitable immunity."  *See* Pl.'s Memo., p. 18.  Plaintiff's discussion relating to charitable immunity and which state has a greater interest in its policy concerning charitable immunity is thus facially inadequate, reflecting a fundamental misunderstanding of the rich judicial history and the targeted legislative responses to any perceived shortcomings in applying the doctrine of charitable immunity as an important component of Massachusetts tort law.  Similarly, her discussion of the parties' "expectations" is limited to the conclusory statements that it was Plaintiff's "justified expectation" that the "amount she could recover" for her injury would be governed by New York law, and that SERI had no "reasonable or justified expectation" that the "draconian" and "anachronistic" charitable cap imposed by c.231, §85K would limit its exposure.  Finally, Plaintiff seeks to introduce "the insurance factor" into this analysis, notwithstanding that Massachusetts courts have summarily rejected that "factor" as an element worthy of consideration.  Plaintiff's reasoning and her conclusion that New York law governs this issue is therefore incorrect for a number of reasons.

**1.   Massachusetts' Interest In Its Charitable "Cap"**

Unlike its all-but-forgotten status in New York, the importance of the charitable cap of $20,000 to Massachusetts tort law is undeniable, having withstood not only judicial criticism from within its own highest court but also constitutional challenges.  More importantly, perhaps,

the Legislature has shown a continued interest in making the statute remain relevant and contemporary, *i.e.*, not an "anachronism." As such, the statutory recognition of limited tort immunity of charitable institutions in Massachusetts must be given priority in the resolution of the choice-of-law dispute between New York and Massachusetts with respect to that particular issue.

### A. The Origins Of The Charitable "Cap"

The doctrine of charitable immunity in Massachusetts – the first jurisdiction in the United States to adopt that defense, *see St. Clair* v. *Trustees of Boston University*, 25 Mass. App. Ct. 662, 666 (1988) – and its progeny, M.G.L. c.231, §85K, dates back almost 150 years. *McDonald* v. *Massachusetts Gen. Hospital*, 120 Mass. 432, 436 (1876). In the 95 years between the Supreme Judicial Court's adoption of the doctrine and the Massachusetts Legislature's enactment of §85K, the SJC applied the doctrine numerous times to preclude not only negligence claims but also claims alleging "reckless, willful or wanton" misconduct against various types of charitable institutions and their agents. *St. Clair*, *supra* at 666-667, *citing Farrigan* v. *Pevear*, 193 Mass. 147 (1906); *Roosen v. Peter Bent Brigham Hosp.*, 235 Mass. 66 (1920); *Reavey* v. *Guild of St. Agnes*, 284 Mass. 300 (1933); *Bearse* v. *New England Deaconess Hosp.*, 321 Mass. 750 (1947); *Simpson* v. *Truesdale Hosp.*, 338 Mass. 787 (1958); *Boxer* v. *Boston Symphony Orchestra, Inc.*, 342 Mass. 537 (1961). Indeed, the SJC commented in *St. Clair* that it believed "if a case involving a tort such as intentional interference with advantageous relations or slander uttered recklessly by an agent of a charitable organization had been presented in Massachusetts before 1971, charitable immunity would have applied." *Id.* at 667.

The principal basis for the SJC's recognition of a doctrine affording a complete bar to tort claims against a charitable institution was that "whatever [funds] it may receive from any source

it holds in trust to be devoted to the object of sustaining the [institution] and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses." *McDonald*, *supra* at 435.  Some 30 years later, the SJC further explained this "trust fund" rationale by observing, "Among the reasons for giving this exemption it has been said, that being a charitable institution rendering services to the public without pecuniary profit, if the property of the charity was depleted by the payment of damages its usefulness might be either impaired or wholly destroyed, the object of the founder or donors defeated, and charitable gifts discouraged[.]" *Farrigan*, *supra* at 149.  Subsequent decisions of the SJC underscored the continuing recognition of the doctrine on the basis of "the trust fund" rationale.  *See*, *e.g.*, *Roosen*, *supra* at 72 ("a corporation organized and maintained solely for the treatment of the sick as a public charity cannot be held liable for injuries to a patient caused by the negligence either of its managers of [sic] its employees; the basis for decision being that trusts for charities cannot thus be diverted and the benevolent designs of the donors thus be thwarted[]"); *Foley* v. *Wesson Memorial Hospital*, 246 Mass. 363, 365 (1923) ("under the Massachusetts doctrine, that these trust funds cannot be used to compensate wrongs committed by agents of those administering the funds, there is no ground for distinction between liability to a patient and liability to a stranger[]");  *Boxer supra* at 539, *quoting* Restatement (Second): Trusts §374, comment f ("'Some of these trusts [for community purposes] can be supported on the ground that they tend to promote the health of the community … or involve a form of education … but it is sufficient that they promote the general happiness of the community.'")

In 1958, the SJC recognized that recognition of the doctrine of charitable immunity had become the subject of criticism and outright repudiation by other courts and "distinguished text writers," *Simpson*, *supra* at 787, *citing* 25 A.L.R.2d 29, 142, and Prosser on Torts (2d ed.), 784-

4

788, and Harper and James, Torts §29.16, and even observed that "the doctrine might not commend itself to us today[.]" However, in declining plaintiff's request to overrule *McDonald*, the Court commented that "it [the doctrine] has been firmly embedded in our law for over three quarters of a century and we think that its 'termination should be at legislative, rather than at judicial, hands.'" *Simpson supra* at 787-788, *quoting Comeau* v. *Harrington*, 333 Mass. 768, (1955). By 1969, in *Colby* v. *Carney Hospital*, 356 Mass. 527 (1969), the SJC observed that "[n]ow it appears that only three or four States still adhere to the doctrine." Accordingly, it announced that "we take this occasion to give adequate warning that the next time we are squarely confronted by a legal question respecting the charitable immunity doctrine it is our intention to abolish it." *Id.* at 528.

In response to the SJC's admonition in *Colby*, the Massachusetts Legislature abolished charitable immunity in 1971 by enacting c.231, §85K. It was in this context that Governor Francis Sargent, as a proponent of the statute, stated that "certain institutions, by their nature and the quality of their character of their charitable behavior, should be treated differently, with regard to their legal liability, from those institutions of a different nature." 1971 House Doc. 5976 (Governor's address to the Legislature). Thus, it was "'necessary to balance the desirability of protection for [charitable] corporations … against the interest of the person who is injured as a result of a tort for which the nonprofit corporation is responsible.'" 1971 House Doc. 5976, quoting recommendations of the Forty-sixth Annual Report of the Judicial Council. Charitable medical institutions were among those specifically targeted to be "treated differently." 1971 House Doc. 5976, *supra*.

The only exception to the statute's abrogation of the doctrine was to limit the liability of a charitable institution which committed a tort "in the course of any activity carried on to

5

accomplish directly the charitable purposes" of the institution to $20,000.  The statute also effectively codified the judicially-created exception to the doctrine, which had held that charitable immunity was not available as a defense to an institution where the income generated was unrelated to any specific charitable purpose but only used to provide "general uplift" to the institution's finances.  See *McKay* v. *Morgan Memorial Co-Op, Indus. & Stores, Inc.*, 272 Mass. 121, 124-126 (1930). Decisions by the SJC which followed the enactment of c.231, §85K underscored the Massachusetts judiciary's recognition of the legislative compromise which resulted in the limited immunity conferred upon charitable institutions by the statute.

Subsequently, in *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423 (1989), *cert. denied*, 493 U.S. 1056 (1990), the SJC considered a constitutional challenge to the $20,000 limitation of liability conferred on charitable institutions by the statute.  Although the Court was "not without misgivings about the paltriness of the $20,000 cap," it nevertheless held that "we cannot correctly declare the statute to be unconstitutional.  A change in the amount of the cap may be appropriate but that is a legislative decision." *Id.* at 426.  The Court carefully considered plaintiffs' argument that the $20,000 limitation of liability violated her right to a jury trial under the Massachusetts Constitution but determined that the statutory limitation entitled her to "have the jury assess damages up to $20,000 but nothing more."  The Court similarly rejected their arguments that the $20,000 cap violated her rights of equal protection and substantive due process under the United States and Massachusetts Constitutions, observing that the statute did not burden either a suspect group or a fundamental right, and that there was a "rational basis" for it and that it was "reasonably related to a permissible legislative objective."  The Court noted – after re-tracing the history of charitable immunity and the creation of the charitable cap:

> The rational basis test "includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the

> harm to the members of the disadvantaged class." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 452 (1985) (Stevens, J., concurring). In connection with such an analysis, the significance of a limitation of $20,000 on recovery against charities for personal injuries is a relevant factor.
>
> The plaintiffs' equal protection attack is two-fold. They argue that (1) §85K has no legitimate purpose, and (2) even if §85K has a legitimate purpose, the means chosen by the Legislature to accomplish the objective bear no rational relation to it. The objective of §85K clearly is to protect the funds of charitable institutions so they may be devoted to charitable purposes. That objective is just as clearly legitimate. … The plaintiffs argue that the protection of charitable organizations' property against judgments in personal injury actions is not a legitimate objective because the availability of insurance, … make statutory protection, at least as to hospitals, unnecessary. However, the availability of these sources of protection of charitable funds is not inconsistent with a legislative purpose to provide still further protection.
>
> …
>
> The plaintiffs' final argument is that §85K offends their substantive due process rights by failing to provide an adequate substitute for the common law right to recover full compensation for negligently inflicted injuries. In cases such as this, in which the right infringed on is not a "fundamental" right, we have stated that the question under the due process clause of the Federal Constitution is "whether the statute bears a reasonable relation to a permissible legislative objective," [citation omitted], and, under the analogous provisions of the State Constitution as whether the statute "bears real and substantial relation to public health, safety, morals, or some other phase of the general welfare." [Citation omitted.] … In addressing the plaintiffs' equal protection argument, we determined that §85K is rationally related to a permissible legislative objective. Further discussion is not required. We conclude that §85K does not offend the plaintiffs' due process rights.

*Id.* at 429-431.

The Legislature's enactment of c. 231, §85W in 1987, which immunized a charity's unpaid trustees, officers or directors from personal liability, provides a further indication that the Legislature continues to recognize the importance of the doctrine of charitable immunity. *See Morrison* v. *Lennett*, 415 Mass. 857, 861-864 (1993). Although the Court noted its "concern," expressed in *English*, about the amount of the cap, it noted that "we have sustained §85K against a variety of challenges. *Id.* The statute must be given the scope intended for it by the Legislature [,]" *citing Mullins v. Pine Manor College,* 389 Mass. 47 at 63-64 (1983).

7

As plaintiff correctly notes, in *Conners* v. *Northeast Hosp. Corp.*, 439 Mass. 469 (2003), Justice Ireland expressed his "concern[] when statutes are used to shield responsible parties from liability," and commented that c.231, 85K was "not only monetarily outdated but also fails to recognize the evolving roles or traditionally charitable institutions." Justice Ireland indicated, however, that he agreed with the majority's opinion that "the result in this case is mandated by G.L. c.231, §85K," and "call[ed] on the Legislature to address this problem." 439 Mass. at 481 (Ireland, J., concurring). As it had done in 1971 following the SJC's decision in *Colby*, the Legislature responded to this judicial "invitation" to address the perceived problem that the $20,000 charitable cap was "monetarily outdated" – at least, in the context of medical malpractice cases – and raised the charitable cap in such cases to $100,000.

It is therefore readily apparent that the doctrine of charitable immunity, both in its original judicially-created form and in its subsequent incarnation as a statue, is part of the fabric of Massachusetts tort law. In contrast, New York abrogated charitable immunity – which had only been judicially recognized in New York since 1914, *see Schloendorff* v. *Soc'y of N.Y. Hospital*, 211 N.Y. 125 (1914) – 65 years ago. *See Bing* v. *Thunig*, 2 N.Y.3d 656 (1957). Neither the New York General Assembly nor the New York courts have done anything to modify or change the doctrine's defunct status in that time.

### B. Massachusetts Is The State "Primarily Concerned" With The Issue Of Charitable Immunity

Plaintiff correctly notes that §168 of the Restatement (Second) provides that "[t]he law selected by application of §145 determines issues of charitable immunity[,]" but the Comment to §168 specifically notes that "[m]ost cases to date have held that the question of charitable immunity is determined by the local law of the state of conduct and injury. *It may be questioned whether such decisions will invariably be followed in the future in view of the growing*

8

*realization that all issues in tort need not be governed by a single law. The state where conduct and injury occurred will not by reason of these contacts alone be the state that is primarily concerned with the issue of charitable immunity (see §145, Comment d).*" (Emphasis supplied.) *See also Robidoux* v. *Mulholland*, 642 F.3d 20, 26 (1st Cir. 2011), *quoting Lou* v. *Otis Elevator Co.*, 77 Mass. App. Ct. 571, 586 n.27 (Mass. App. Ct. 2010) ("'the law of a single jurisdiction is not necessarily to be applied to all issues in a particular case'; rather we should weigh the relevant considerations 'according to their relative importance to the particular issue involved.'") The language of the Comment to 168 indicates that the fact that Plaintiff's injury occurred in New York means that this factor alone should not dictate which state is "primarily concerned" with the issue of the charitable cap.

Plaintiff has stipulated that any tort committed by SERI was committed in the course of an activity carried on to accomplish directly the charitable purposes of SERI and was not committed in the course of any activity primarily commercial in character. Where *that* "activity," *i.e.*, SERI's development of the product subsequently manufactured, marketed and sold by MIRA[2] as MIRAgel, all took place – which was unquestionably and admittedly (see Pl. Memo p. 19) in Massachusetts – is a distinctly different issue from where the last allegedly negligent act took place, which Plaintiff asserts was New York, where her injury occurred. Thus, the parties' stipulation in this case and Plaintiff's agreement "that Massachusetts is the place of SERI's conduct [allegedly] causing injury" (id.) underscores the legal conclusion that Massachusetts is the state which is "primarily concerned" with the particular issue of the applicability of the cap, notwithstanding New York was the site of the implantation of the MIRAgel into Plaintiff's eye or her subsequent injury allegedly caused by that product.

---

[2] See Ex. 23, MIRA's Answers to Interrogatories propounded by SERI, No. 12.

Although there is apparently no Massachusetts case that has considered the choice-of-law issue posed by the precise set of facts as they are aligned in this particular case, the SJC's decision in *Cosme* v. *Whitin Mach. Works*, 417 Mass. 643 (1990) is instructive. In *Cosme*, the Court declined to enforce a Connecticut statute of repose to protect a Massachusetts corporation which had sold a product which injured a Massachusetts resident in Connecticut, observing that Massachusetts had no comparable statute of repose and that, because defendant was not a Connecticut corporation, its interest in applying that statute of repose was "not as compelling in the circumstances as it would be if [defendant] were a Connecticut business, and Connecticut's corresponding interest in protecting its courts from such claims is obviously not at stake" where Massachusetts was the forum state. 417 Mass. at 648-649. *See also* discussion concerning *Pevoski*, *supra*, §3 of SERI's instant Reply/Opposition brief.

In the present case, Plaintiff has effectively stipulated that all of SERI's activities at issue involving MIRAgel took place in Massachusetts and furthered SERI's charitable purpose. Massachusetts is the forum state, such that New York's interest in permitting its residents to recover damages unaffected by a cap on the liability of a charitable institution in Massachusetts is significantly less important than Massachusetts' interest concerning conduct in Massachusetts and concerning Massachusetts corporations. Moreover, the charitable immunity doctrine and the subsequent enactment of c.231, §85K remains a "fundamental policy" engrained in Massachusetts tort law. As a result, with respect to the issue of the applicability of the charitable cap, Massachusetts bears the most significant relationship to that issue.

Moreover, even had Plaintiff brought this case in New York, New York courts presumably would have concluded, as a matter of choice-of law analysis, that the charitable cap would apply. In *Schultz* v. *Boy Scouts of Am.*, 65 N.Y.2d 189 (1985), the Court of Appeals held

that defendant, a New Jersey corporation, was afforded the protection of the New Jersey charitable immunity statute barring plaintiff's claims arising out of the sexual abuse of plaintiff's decedent by one of defendant's agents.  The Court of Appeals so ruled, notwithstanding that most of the abuse had taken place in New York (and only to a lesser extent in New Jersey).  Although the Court of Appeals declined to find sufficient contacts between New York, the parties and their transaction, it effectively rejected the argument that the New Jersey statute was contrary to New York "public policy" abrogating charitable immunity, observing:

> The party seeking to invoke the doctrine has the burden of proving that the foreign law is contrary to New York public policy.  It is a heavy burden for public policy is not measured by individual notions of expediency or fairness or by a showing that the foreign law is unreasonable or unwise.  [Citation omitted.]  Public policy is found in the State's Constitution, statutes and judicial decisions and the proponent of the exception must establish that to enforce the foreign law "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal expressed in them[.]"  [Citations omitted.]

65 N.Y.2d at 202.  *See also Nelson v. Massachusetts General Hospital*, 04-CV-5382; 2007 U.S. Dist. LEXIS 70455, *36-38 (U.S.D.C. S.D.N.Y., 2007) ("It is, therefore, far from a foregone conclusion that this court, were it to retain the case, would decline to enforce the Massachusetts charitable immunity statute. But a district court sitting in Massachusetts, if confronted with this open issue, would almost certainly refuse to resolve an unsettled issue of New York law in a way that ignores the public policy of the state in which it sits.").

    **2. The Parties' Expectations**

Plaintiff argues that it was her "expectation" throughout that New York law would apply to any claim for damages for personal injury that she brought as a result of the surgical procedure she underwent in New York.  *See* Pl's Memo., p. 20.  Putting aside for the moment the improbability of this assertion from someone admittedly not trained in the law, the Court has ruled that New York law does apply to the tort liability issues in the case.  However, that

particular ruling did not consider which state's law applies to the specific issue of the applicability of the charitable cap to limit the amount of damages, if any, that might be awarded Plaintiff.  Similarly, even assuming, *arguendo*, that Plaintiff "expected" New York law to apply to her claim, it defies all credulity that she would have considered that, in the context of her decision to sue a Massachusetts charitable corporation and as a matter of a choice-of-law analysis to be conducted by this Court, the charitable cap statute would or would not apply.[3]

In sharp contrast, SERI has been a charitable institution since its incorporation almost 70 years ago.  At the time of its incorporation, as a charitable entity, Massachusetts law afforded it complete immunity from tort liability.  SERI's "expectation," thus, was that it would not face the prospect of depleting its resources to pay for damages awarded to plaintiffs asserting personal injury claims against it.  *Compare Butkera* v. *Hudson River Sloop Clearwater, Inc.*, 693 A.2d 520, 523-524 (N.J. Super. 1997) (noting that, where defendant charitable organization was incorporated in New York after the abrogation of charitable immunity, "[i]t must, therefore, be deemed to have done so with full knowledge and acceptance of the tort consequences flowing from its negligent actions.")  When c. 231, §85K was enacted in 1971, SERI's "expectation" was modified to reflect that it no longer was to be afforded complete immunity and would only be protected from tort liability-related judgments in excess of $20,000 which "directly accomplished" its charitable purposes.  Enforcement of that statute in the present circumstances would be consistent with SERI's "expectation" in that regard; repudiating the reach of the statute, as a matter of choice-law law analysis in this case, would effectively ignore not only that

---

[3] See, e.g, Restat. 2d, §6, cmt. d ("There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied.  In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.").

"expectation" but nearly three-quarters of a century of reliance upon that "expectation."[4] Thus, Plaintiff's contention to the contrary, *i.e.*, that SERI had no "justifiable" expectation that the charitable cap would apply in these circumstances, *see* Pl.'s Memo., p.21, is unsupported.[5]

### 3. Insurance

Plaintiff briefly raises the fact that SERI is insured for Plaintiff's claim as another reason for this Court to consider as part of its choice-of-law analysis. *See* Pl.'s Memo., p. 24. The SJC, unlike courts in other jurisdictions, has summarily rejected the presence or absence of insurance to protect a charitable institution's assets as a factor which should affect the doctrine of charitable immunity, as since modified by c.231,§85K, in Massachusetts. *See English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 429 (1989), *cert. denied*, 493 U.S. 1056 (1990) ("the availability of these sources [including insurance] of protection for charitable funds is not inconsistent with a legislative purpose to provide still further protection.").

Moreover, Plaintiff cites *Pevoski v. Pevoski,* 371 Mass. 358, 361 (1976) as support for her argument that insurance is a relevant factor, but the discussion of insurance in that case focused on whether Massachusetts should recognize interspousal immunity in automobile tort cases, and not the choice of law analysis. Before it discussed insurance, the Court decided the choice of law issue and determined that Massachusetts law should apply to the question of whether a spouse could maintain an automobile tort claim versus the other spouse, even though the automobile accident occurred in New York and the law of New York governed the rules of the road. Id. p. 361. After deciding the choice of law issue and that Massachusetts law applied to

---

[4] In that context, SERI's "expectation" in this regard is not necessarily connected to whether its alleged actions in this particular case were, e.g., negligent, but rather is connected to what it, as a Massachusetts charitable corporation, expected in terms of its exposure to liability.

[5] SERI's expectation in this regard is further supported by the admitted fact that the SERI's relevant conduct occurred in Massachusetts and in furtherance of SERI's charitable purpose. See Pl. Memo p. 19; Ex. 27.

13

question of interspousal immunity in this setting, then the Court discussed how the existence of automobile insurance might mean that the expectations of the defendants and insurers would not be altered by the new substantive Massachusetts rule that a spouse may sue another spouse for automobile torts. Id.

Consequently, the Court should not consider the availability of insurance as a factor to consider as part of its choice-of-law analysis. Notwithstanding, the *Pevoski* case is an example of when a Massachusetts Court determined that although the tort law of another jurisdiction applied to one substantive issue in the case (the rules of the road of New York), Massachusetts law applied to another substantive issue in the case (interspousal immunity).

> The Schepens Eye Research Institute, Inc.,
>
> By its Attorneys,
>
> */s/ William P. Mekrut*
> **Richard J. Riley, BBO#420610**
> **William P. Mekrut, BBO#654350**
> **MURPHY & RILEY, P.C.**
> **100 Franklin Street, Suite 500**
> **Boston, MA  02110**
> **(617) 423-3700**
> **wmekrut@murphyriley.com**

**Dated:  December 5, 2022**

## CERTIFICATE OF SERVICE

I, William P. Mekrut, do hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via the CM/ECF system of the United States District Court for the District of Massachusetts.  To the extent that any appearing party or its counsel are not registered on the CM/ECF system, this document has been served via first-class mail, postage prepaid, on this 5th day of December, 2022.

> **/s/ William P. Mekrut**