UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NANCY DALEY,<br><br>    Plaintiff,<br><br>v.<br><br>MIRA, INC., & THE SCHEPENS EYE RESEARCH INSTITUTE, INC., f/k/a EYE RESEARCH INSTITUTE OF RETINA FOUNDATION,<br><br>    Defendants. | Civil No. 18-10353-LTS |

ORDER ON DEFENDANT SCHEPENS EYE RESEARCH
INSTITUTE'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 165)

October 30, 2023

SOROKIN, J.

Nancy Daley has sued two defendants, alleging claims arising from an eye surgery she underwent in 1986. Schepens Eye Research Institute, Inc. ("SERI"), seeks summary judgment on the sole claim remaining against it. Doc. No. 165.[1] Daley opposes. Doc. No. 177. The motion is fully briefed, and the Court heard the parties on October 25, 2023.[2] Doc. No. 186. As explained herein, SERI's motion is ALLOWED.

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docket; pincites are to the page numbers in the ECF header, which may differ from numbering included elsewhere as part of the original document.

[2] After SERI filed its reply, Daley sought leave to file a sur-reply. See Doc. No. 183 (making request but not attaching a proposed sur-reply for the Court's consideration). The Court denied Daley's motion, Doc. No. 184, but began the motion hearing by permitting Daley's counsel to address without limitation the points he would have included in a sur-reply.

I.  BACKGROUND[3]

SERI, a charitable Massachusetts corporation, designed a "scleral buckling device"—a surgical implant used to treat retinal detachment—that was ultimately sold under the name MIRAgel.  SERI began testing the implant in the 1970s and acquired a patent for it in 1984.  Mira, Inc., a for-profit corporation run by the son of SERI's founder, sought and obtained necessary federal authorization to market the implant and, in 1985, entered into a licensing agreement with SERI granting Mira the exclusive, worldwide right to sell the implant.

Daley had surgery in New York in October 1986, and her doctor used a MIRAgel implant to repair a retinal detachment in Daley's left eye.  Despite the procedure's initial success, the MIRAgel implant began to swell and decay in Daley's eye over time.  Her surgeon learned of complications arising from MIRAgel implants in the 1990s, but he did not recommend or undertake surgical removal of Daley's implant until January 2016—after Daley had begun experiencing problems herself, and two decades after the defendants had removed MIRAgel from the market.  Doc. No. 161-1 ¶¶ 41-42.  According to Daley's surgeon, the degree and manner of the implant's swelling prevented its successful removal, ultimately necessitating further surgery to remove Daley's left eye.  Doc. No. 172 ¶ 7.

Daley sued SERI and Mira in February 2018.  Doc. No. 1.  Her Amended Complaint asserted six causes of action against the defendants, but Daley's case against SERI has been winnowed to a single remaining claim: strict products liability due to a design defect.  See Doc. No. 177 at 1 n.1 (specifying that "the only Claim for Relief before the Court as against the

---

[3] The Court recounts here only those facts necessary to resolve the single legal question upon which it finds SERI's motion hinges.  It relies on the parties' papers, including the Statements of Material Undisputed Facts submitted with the present motion and with the earlier cross-motions for partial summary judgment related to available damages.  Doc. Nos. 175, 161-1.

Defendant SERI is the Plaintiff's Second Claim for Relief . . . for product liability").[4]  The record contains three expert reports that include statements bearing on Daley's claim that MIRAgel was defectively designed.  Daley's own expert, relying on reports in medical literature published years after Daley's surgery, points to "an unacceptable" removal rate due to complications caused when the implants swelled over time.  He does not, however, suggest that SERI knew or reasonably could have known of the complications when it designed MIRAgel or at any other point in time before Daley received her implant.  See generally Doc. No. 165-5.  SERI's experts opine that, at the time it was designed and when it was used by Daley's surgeon, MIRAgel was a state-of-the-art device that had been developed and tested consistent with then-existing medical and industry standards.  See Doc. No. 165-6 at 17 (opining that "MIRAgel was state-of-the-art at the time it was implanted in Ms. Daley's left eye," and that it was "developed through a careful and systematic approach that met the industry and medical standards of the time"); Doc. No. 165-7 at 7-8 (opining that "MIRAgel was designed, developed, and cleared for market consistent with accepted scientific and industrial processes for medical devices available at the time of review").

     Daley concedes that she can point to no evidence suggesting the tests SERI performed when developing MIRAgel were flawed or inadequate.  Doc. No. 175 ¶¶ 11-12.  She acknowledges she lacks evidence "that more scientifically appropriate testing would have disclosed the longer term complications associated" with MIRAgel before Daley received her implant in 1986.  Id. ¶¶ 12-13; cf. Doc. No. 165-7 at 7-8 (noting absence of available testing or studies, in 1986 and now, that could "simulate degradation" or "recreate the complexities" of the

---

[4] Three claims were previously dismissed as to SERI.  Doc. No. 62 at 2, 5.  Daley has now relinquished two more, Doc. No. 177 at 1 n.1, leaving only one claim as far as SERI is concerned.  Mira has pursued no timely challenges to any of Daley's claims against it.

implant's long-term environment within a patient's eye). Indeed, Daley has voluntarily withdrawn her claim asserting negligent pre-market testing, admitting: "It does not appear that technology existed in 1984 to determine that MIRAgel would swell after five or more years after having been implanted into the eye."[5]  Doc. No. 177 at 1 n.1.

## II. DISCUSSION[6]

In a design-defect case, a plaintiff does not allege "that there was something wrong with [the] product in the sense that it was made defectively or had a mechanical flaw," but instead claims that the "whole line of products was defective because with knowledge of the dangers and options available, the manufacturer conceived a potentially dangerous design." Bolm v. Triumph Corp., 422 N.Y.S.2d 969, 973 (N.Y. App. Div. 1979). Under long-standing New York law, if a strict products liability claim is premised on a design-defect theory, the "manufacturer's liability is determined by the traditional reasonable man test used in negligence actions."[7]  Id. at 973-74; cf. Rainbow v. Albert Elia Bldg. Co., 436 N.Y.S.2d 480, 484 (N.Y. App. Div. 1981)

---

[5] Daley has also surrendered "her claim alleging violation of a post-sale duty to warn," conceding her surgeon was "aware of the risks of MIRAgel in the early 90s." Doc. No. 177 at 1 n.1. Her expert even describes having used MIRAgel implants in his own practice during or soon after 1990, "very early in [his] career," until reports of complications began "to surface." Doc. No. 165-5 at 6.

[6] The parties agree, and prior rulings of this Court have determined, that New York tort law governs this action. The Court applies the familiar Rule 56 standard. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (endorsing entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); Barbour v. Dynamics Rsch. Corp., 63 F.3d 32, 37 (1st Cir. 1995) (noting that, if motion is "properly supported," then "the burden shifts to the non-moving party, who . . . must set forth specific facts showing there is a genuine issue for trial").

[7] The Court focuses its discussion on the legal standards applicable to the theory of liability Daley pursues. It need not delve into the elements of other types of products liability claims recognized by New York courts. See Voss v. Black & Decker Mfg. Co., 450 N.E.2d 204, 207 (N.Y. 1983) (identifying "a mistake in the manufacturing process" and "fail[ure] to provide adequate warnings regarding use of the product" as the other available theories).

(noting design-defect claim "involves considerations of reasonable care" and is "conceptually analogous to negligence"); Bolm v. Triumph, 305 N.E.2d 769, 772-74 (N.Y. 1973) (describing "standards for imposing liability for . . . design defects" as derived from "general negligence principles").[8]

To prove liability for a design defect, a plaintiff must prove the defendant "had knowledge that the design of its [product] was potentially dangerous and that other, safer designs were available and feasible." Bolm, 422 N.Y.S.2d at 974. This inquiry focuses on the moment of production or the time of the injury.[9] See id. (limiting relevant evidence to that which bears on whether there was a "lack of care at the time of the accident"); Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 443 (N.Y. 1980) (centering inquiry on condition of product "at the time it leaves the seller's hands"); cf. Denny v. Ford Motor Co., 662 N.E.2d 730, 735 (N.Y. 1995) (describing reasonableness assessment as occurring "in light of . . . situational . . . factors" including "proof about the manufacturer's choices" and "judgment"). It follows, then, that the designer of a product can defend against a design-defect claim by offering proof "that its design conforms to the state of the art at the time of manufacture." Bolm, 422 N.Y.S.2d

---

[8] The first issue Daley addressed at the motion hearing when invited to respond to SERI's reply brief, and one her counsel pursued vigorously, was SERI's citation to a provision in the Restatement 3d of Torts that would tie a medical device manufacturer's liability for a design defect to "foreseeable risks of harm." See Doc. No. 182 at 4. Though the Court does not rely on the Restatement in resolving the pending motion—nor did SERI rely on it exclusively or even primarily—the foreseeability principle expressed in the cited section appears altogether consistent with the body of caselaw cited herein applying negligence concepts to actions such as this. See, e.g., Bolm, 305 N.E.2d at 772 (discussing precedent holding "that injuries resulting from a latent defect in design which, to the reasonably prudent manufacturer, creates a foreseeable risk of harm should be actionable" (emphasis added)).

[9] As there is nothing in the record suggesting the analysis would differ due to a change in available testing or standards between 1984 (the time of design) and 1986 (the time of Daley's surgery), the Court need not resolve which of those moments controls.

at 975 n.2; cf. Voss, 450 N.E.2d at 210 (explaining liability turns on "the design of the product in light of the state of the art at the time of production").[10]

State and federal courts in New York have often considered the admissibility of studies, reports, and other evidence arising after the relevant product was designed, manufactured, and used by the injured party. The reasoning articulated in that line of cases underscores the temporal limitation on the scope of inquiry governing strict products liability claims, including those alleging a design defect. In particular, courts applying New York law emphasize that a defendant's liability depends on "what, with the exercise of reasonable care, is knowable about a product," and "whether the dangers" cited by the plaintiff "were reasonably foreseeable or scientifically discoverable" when the plaintiff used or was injured by the product. George v. Celotex Corp., 914 F.2d 26, 29 (2d Cir. 1990) (cleaned up);[11] see Rainbow, 436 N.Y.S.2d at 484

---

[10] Voss is a case on which both parties focused as a key precedent laying out standards governing design-defect claims under New York law. At the motion hearing, Daley's counsel insisted several times that Voss includes no reference to "state of the art" as a defense or component of the analysis applicable to such claims. That is incorrect. In its penultimate paragraph, Voss expressly "note[s] that as to the cause of action in strict products liability . . . the design of the product in light of the state of the art at the time of production is the issue." 450 N.E.2d at 210 (emphasis added). And, as discussed herein, Voss is plainly not the only case in which such a defense or limitation has been recognized by a court applying New York law. See, e.g., Magadan v. Interlake Packaging Corp., 845 N.Y.S.2d 443, 445 (N.Y. App. Div. 2007) (granting summary judgment on a design-defect claim where the defendant had made a prima facie showing that its product "was state of the art" and conformed to relevant safety standards at time of manufacture, and the plaintiff failed to adduce evidence generating a "triable issue of fact" as to whether a safer alternative design was feasible "at the time the [product] was manufactured"); Wesp v. Carl Zeiss, Inc., 783 N.Y.S.2d 439, 441 (N.Y. App. Div. 2004) (same, citing Voss).

[11] In George, the Second Circuit discussed and distinguished Bolm, where the admission of post-accident studies as proof of a defect was reversible error because the plaintiff had not established the studies were "realistically capable of achievement" or "within the state of the art at the time of manufacture." 422 N.Y.S.2d at 975 & n.2; see 914 F.2d at 29-30. The report at issue in George was different (and admissible proof on the existence of a defect about which the manufacturer had a duty to warn) because it "was not only 'technically' or 'ultimately' possible during the relevant time period, but was in fact set forth in a report that existed at that time," showing others in the industry were aware of and studying the potential for the relevant danger, even if the defendant was not. 914 F.2d at 29-30. Thus, the report in George was probative of

6

(finding post-accident studies inadmissible where "plaintiff failed to lay a proper foundation . . . by establishing [they] were within the state of the art at the time of manufacture" or "related to the technology of the industry at the time of manufacture");[12] see also Gonzalez v. Digit. Equip. Corp., 8 F. Supp. 2d 194, 197 (E.D.N.Y. 1998) (Weinstein, J.) (deeming admissible internal reports of other manufacturers in industry, which were "relevant for purposes of showing that possible dangers of a product were discoverable by the manufacturer either before or at the time of the plaintiff's injuries"); cf. Micallef v. Miehle Co., 348 N.E.2d 571, 578 (N.Y. 1976) (noting evidence bearing on "whether a manufacturer . . . kept abreast of recent scientific developments" was relevant to assessing whether "reasonable skill and knowledge" was exercised in design of product).[13]

Nothing in the record before the Court creates a genuine dispute that a jury could resolve in Daley's favor to find SERI liable for a design defect under the standards summarized above. SERI has adduced evidence from both of its experts that MIRAgel was designed using testing and science that were state-of-the-art at the relevant time. Doc. No. 165-6 at 7-8, 17; Doc. No. 165-7 at 7-8, 22, 27, 30. Daley's expert did not dispute that assessment in his written report or his deposition. Indeed, he conceded his opinion that MIRAgel was defective is rendered "in retrospect," Doc. No. 165-10 at 94, 104, and he expressly declined to opine that a reasonable manufacturer could have known at the time of Daley's surgery that complications would arise

---

whether the manufacturer had fulfilled its "duty to test fully and inspect its products to uncover all dangers that are scientifically discoverable." Id. at 28 (emphasis added).

[12] In Rainbow, the court acknowledged that jurors balancing benefits against risks in design-defect cases confront "matters that are frequently scientific" and "sometimes arcane." 436 N.Y.S.2d at 485. It concluded that, because this "process is imprecise," "in all fairness the inquiry should be limited to the technology which exists at the time of manufacture." Id.

[13] The Micallef court also observed that a manufacturer of a product is "under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out." 348 N.E.2d at 576.

years later, id. at 105-06, 109.[14]  Without evidence which could support an inference that MIRAgel's alleged defect was knowable or scientifically discoverable before Daley's 1986 surgery—and Daley concedes that she lacks such evidence, Doc. No. 177 at 1 n.1—SERI's uncontradicted evidence leaves no genuine dispute about whether MIRAgel was defectively designed under New York law.

Daley's only attempts to avoid this inevitable conclusion fail.  Though she initially urged the Court not to rely on the reports of SERI's experts because they were "unsworn and [of] no evidentiary value," e.g., Doc. No. 175 at 2, SERI has now provided sworn affidavits from both experts verifying the accuracy of the reports and confirming the opinions they contain, Doc. No. 182-1.  Next, Daley attempted to generate a dispute sufficient to avoid summary judgment by pointing to two publications by doctors affiliated with SERI and MIRAgel.  Doc. No. 175 at 5.  The Court has reviewed the cited articles and concludes they would not permit a layperson to draw any conclusion at all about whether the issues that eventually arose with MIRAgel were known or knowable in the mid-1980s.  See Doc. No. 174-1 (reproducing 1964 article by SERI's founder describing one type of complication that arose with a different device once used in retinal surgery); Doc. No. 174-2 (reproducing 1971 article by MIRAgel's inventor describing potential benefits of using implants made of "crosslinked hydrophilic polymers" that would expand a known and finite amount once placed in the eye).  Without more—and Daley has produced no more—articles that predate the relevant time period by at least fifteen years and

---

[14] In light of the decisions noted above, finding post-injury evidence inadmissible if it does not arise from information, tests, or scientific standards that were available at the time the product was designed and used by the plaintiff, there is serious reason to doubt whether the opinion of Daley's expert as to the alleged defect is admissible at all.  See Rainbow, 436 N.Y.S.2d at 485 (noting state-of-the-art inquiry bears on admissibility of plaintiff's evidence, and warning that "testing unavailable when the product was made should not be admissible to prove that the manufacturer, wiser and more experienced on [some later] day, was foolish before").

contain no assessment of the product and complication actually at issue simply cannot support an inference that SERI could have discovered the defect Daley alleges in this case before the time she received her implant.[15]

In sum, even drawing all reasonable inferences in her favor, Daley has identified no evidence that creates a triable issue on the question of whether MIRAgel suffered from a defect that was knowable at the time of her surgery. SERI, on the other hand, has presented what amounts to uncontested evidence that its product was state-of-the-art during the relevant time. In these circumstances, SERI is entitled to judgment as a matter of New York law.[16]

---

[15] Besides these arguments advanced in her papers, during the hearing Daley's counsel pointed to three additional reasons not to embrace SERI's evidence that MIRAgel was state-of-the-art when it was designed. To the extent these arguments are not waived based on Daley's failure to advance them in her papers, they fail on their merits. First, the fact that Daley has "not conceded" MIRAgel was state-of-the-art does nothing to rebut or undermine the expert opinions SERI has offered concluding it was. Second, the post-deposition declaration of Daley's expert adds little to the mix. In the declaration, the expert simply reiterates his backward-looking opinion that a device connected to complications years down the road could not have been "state of the art" when designed. Doc. No. 172 ¶ 35. He does not opine that industry standards or available testing in 1984 (or 1986) should or even could have rendered the eventual complications foreseeable or knowable. Indeed, he appears to misunderstand the meaning of "state of the art" in this context, linking it to "laudatory claims" made about the product by SERI and its agents rather than to the state of scientifically available testing and prevailing safety standards in the industry at the time. Id. ¶ 34. And finally, Daley's counsel directed the Court's attention to Exhibit U (Doc. No. 174-21)—one of many exhibits submitted to the Court but not cited or discussed in Daley's papers. That exhibit is a two-page memorandum appearing to summarize topics discussed at a meeting regarding the product later marketed as MIRAgel, and it briefly references a general recommendation by the inventor that the "package insert" should include a statement "regarding the change in size of the implant over time." Id. at 3. No juror could reasonably infer from that document that SERI knew in 1984 that the implant might foreseeably swell over the course of a decade to the point of causing serious complications.

[16] In light of this conclusion, the Court need not reach various other issues debated by the parties in their papers, including: whether SERI is liable as a manufacturer by virtue of its relationship with Mira; whether Daley is obligated to prove the existence of a safer alternative to MIRAgel, cf. Voss, 450 N.E.2d at 208-09 (listing factors a finder of fact "may consider" in weighing risks and stating such factors "may include" the availability of a safer design (emphasis added)); and whether the balancing of risks and benefits can be evaluated on summary judgment.

III.   CONCLUSION

Because the record contains no evidence that would permit a factfinder to conclude, in light of the available technology at the relevant time, that SERI defectively designed MIRAgel, SERI's Motion for Summary Judgment (Doc. No. 165) is ALLOWED.  Judgment will enter in favor of SERI on the remaining claims against it (Counts I, II, and III).

That leaves Mira.  It appears the factual and legal deficiencies that have doomed Daley's claims against SERI likely apply with equal force to her claims against Mira.  No later than November 13, 2023, Daley shall SHOW CAUSE why any of her claims against Mira survive the analysis and rulings set forth in this Order and in the February 8, 2019 Order (Doc. No. 62) allowing in part SERI's motion to dismiss.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge